IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2019

**IN RE MALIK G., ET AL.**

**Appeal from the Juvenile Court for Hamblen County**
**No. J170066    Janice Hope Snider, Judge**

_____

**No. E2019-01040-COA-R3-PT**

_____

This appeal concerns the termination of a mother's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Hamblen County ("the Juvenile Court") seeking to terminate the parental rights of Chaunte G. ("Mother") to her three minor children, Malik, Sean and Jaslene ("the Children," collectively). After a hearing, the Juvenile Court found that DCS had proven the grounds of abandonment by failure to visit, substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest a willingness and ability to assume legal and physical custody of the Children, all by clear and convincing evidence. The Juvenile Court found also that termination of Mother's parental rights is in the Children's best interest. Mother appeals to this Court, arguing mainly that terminating her parental rights is not in the Children's best interest because she completed a number of her permanency plan tasks after the petition was filed. First, save for the ground of abandonment by failure to visit, which we reverse, we affirm the grounds for termination found by the Juvenile Court. As for the Children's best interest, despite Mother's tardy completion of some of her permanency plan tasks, the evidence nevertheless proves that it is unlikely she can safely parent the Children any time soon. Applying the standard of clear and convincing evidence, we find that termination of Mother's parental rights is in the Children's best interest. While we reverse one ground for termination, we otherwise affirm the judgment of the Juvenile Court terminating Mother's parental rights to the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S. and KENNY W. ARMSTRONG, J., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Chaunte G.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## <u>Background</u>

In July 2017, the Children were removed from Mother's care and placed into DCS custody on the basis of environmental concerns and alleged exposure to drugs.[1] In August 2017, the Children were adjudicated dependent and neglected. In all, three permanency plans were developed for Mother over the course of the case with an emphasis on rectifying her problems with substance abuse. On November 21, 2018, DCS filed a petition in the Juvenile Court seeking to terminate Mother's parental rights to the Children on five grounds: abandonment by failure to visit, failure to provide a suitable home, substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest an ability to parent. Trial was held over the course of two days in March and May of 2019.

First to testify was Samara Dixon ("Dixon"), a DCS family service worker who had managed the Children's case since May 2018. At the time of removal, the Children were living with Mother in her late grandfather's house, which lacked electricity. Mother tested positive for methadone and suboxone. She produced no prescription for either drug. DCS tried to secure a bed for Mother at Samaritan House but she was denied entry because of her failed drug screen. The Children were placed in a foster home.

Dixon testified initially that Mother visited the Children four times in the four months before the petition was filed. Mother last visited the Children in November 2018. In December 2018, Mother tested positive for methamphetamines, and her visitation with the Children was restricted until she could provide thirty days of clean drug screens. By March 2019, Mother had provided the necessary clean drug screens. When Dixon was first assigned the case, Mother was living off and on with family and friends in Morristown. Mother then moved in with a boyfriend, who proceeded to evict her. Mother and the boyfriend later reunited.

Regarding Mother's progress on her permanency plans, Dixon stated that Mother completed a parenting assessment in January 2019. Mother completed an alcohol and drug assessment in February 2019. Both of these achievements occurred after the petition was filed. As for employment, Dixon testified that Mother worked off and on at

---

[1] Malik was born in May 2005, Sean in June 2006, and Jaslene in October 2008. The Children's father surrendered his parental rights. This appeal concerns Mother's parental rights only.

various jobs. Most recently, Mother was working at a nursing home. Mother and her once-estranged boyfriend live in a home they rent from the boyfriend's mother. Dixon testified that Mother failed to complete intensive outpatient therapy as was recommended in her alcohol and drug assessment. In November 2018, Mother tested positive for methamphetamine, amphetamine, and suboxone. With respect to visitation, Dixon testified that Mother failed to show up on August 27, 2018; September 10, 2018; September 28, 2018; and, October 8, 2018. Mother did appear for a visit with the Children on November 5, 2018, at which time she brought the Children some gifts. Mother provided Dixon proof of housing as of January 2019, although Dixon remained unpersuaded that Mother's housing situation was stable. Dixon continued her testimony on Mother's actions in the case, stating that Mother made some child support payments. Mother told Dixon that she took diet pills, but Dixon stated she had not seen any prescriptions for them from Mother. Dixon testified that Mother had never demonstrated an ability to consistently maintain sobriety. Regarding the Children's current conditions, Dixon stated they are happy and healthy in their foster home.

On cross-examination, Dixon testified that Mother attended only one scheduled visit in the pertinent four month period. Dixon was asked to reconcile her testimony with the petition, which alleged that Mother visited the Children four times in that period. Dixon testified that the petition must have been in error. Dixon then was questioned regarding certain errors contained in Mother's alcohol and drug assessment. The assessment misidentified Mother, an African-American woman, as white, and also stated wrongly that she had a girlfriend. The report also misspelled the name of a drug Mother took. Dixon acknowledged these errors but stated that otherwise, the assessment's information was correct. Concerning Mother's boyfriend, Dixon testified that he had incurred three public intoxication charges and one drug paraphernalia-related charge.

Dixon testified that Kennette Kincaid ("Kincaid"), a family preservation worker for a group called Omni, had been working with Mother to help her comply with the permanency plan. The Court inquired about Omni's role:

> THE COURT: All right. Let's go back on the record with all of that. Okay. So, let me go on the record again. My question was, so, are our tax dollars paying a third party provider to go out and "encourage parents to work a plan", or are they actually assisting those parents in some way?
> THE WITNESS: I don't know where the funding comes from for it, but I know that they are -- It's the family preservation. They go in there and they help them to work their Plan.
> THE COURT: How?
> THE WITNESS: Whatever the parent tells them they need assistance with.
> THE COURT: And that's not what you do?

THE WITNESS: We do that, also.

THE COURT: Okay.

Q. But you'll agree with me from the time you got the case in May of 2018 until January of 201[9], your lack of communication or whatever between my client, you [were] getting nowhere on this Plan?

A. Right.

Q. But, lo and behold, within two months of putting Omni in there, my client does almost everything on this Permanency Plan?

A. I think filing the TPR did that.

Next to testify was Natoya L. ("Foster Mother"), the Children's foster mother. The Children had been in Foster Mother's care since July 2017. According to Foster Mother, the Children's experiences in her foster care had varied somewhat. Foster Mother stated that Jaslene has had some difficulty adjusting but had been doing better the past six months. Malik had adjusted in around two months, and Sean adjusted immediately. Foster Mother supervised phone calls between Mother and the Children. Foster Mother testified that Mother sometimes sounded intoxicated on the phone. Foster Mother stated that she intended to adopt all of the Children should they become available for adoption.

Mother took the stand next, and she was asked extensively about what steps she had taken since the Children were removed from her care. Mother stated, in part:

Q. Okay. Were you in agreement with working the steps on the Perm Plan?

A. Some of, some of the steps, yes.

Q. But not all of them?

A. No.

Q. Okay. [Mother], do you drink?

A. I used to, yeah.

Q. When did you stop?

A. Altogether, it's been almost two months.

Q. Two months?

A. Uh-huh.

Q. Were you given oral mouth swabs for alcohol?

A. Yes, ma'am.

Q. Did you ever come to the DCS office or a provider after you'd been drinking or --

A. Probably.

Q. Probably?

A. (Nodding head up and down.)

Q. Do you know your sobriety date?

-4-

A. Uhm, the 14th of April will be three months.

Q. Okay. Do you recall canceling several parent/child visits?

A. Yes, ma'am.

Q. Okay. Would September 13th of 2017 sound like a correct date for a canceled visit?

A. I can't remember the dates exactly.

Q. September 27th --

A. I can't remember.

Q. -- of 2017?

A. I can't remember the exact dates.

Q. Okay. Do you remember taking a drug screen on October 12th, 2017?

A. I don't remember anything from 2017. I really don't remember that.

Q. So, you don't recall testing positive for methamphetamines and amphetamines?

A. No, ma'am.

Q. So, you don't recall advising the Case Manager that you was taking Phentermine?

A. Yes, ma'am, I do remember telling her that I took Phentermine. I even told her that before I started taking drug tests.

Q. But you don't recall saying it on that date?

A. No.

Q. You never gave her a prescription for Phentermine?

A. No, I never provided her with the bottle, no.

Q. Okay. In October of 2017, where were you living? Can you recall?

A. I'm telling you, I don't know. I can't tell you much about 2017.

Q. Friends' homes?

A. No, I never stayed with a friend. I only stayed with family.

Q. Okay.

A. And most of them needed my help, yeah.

Q. Okay. Do you remember canceling a visit on November 8th of 2017?

A. Ma'am, I'll tell you, I don't remember 2017.

***

Q. Do you remember if there was a visit on September 10th of 2018 in Knoxville?

A. I probably missed it because I probably was working.

Q. Okay. Do you remember receiving any phone calls that day about the visit?

A. Huh-uh.

Q. Okay. Because it indicates that you were a no call, no show.

-5-

A. I don't remember.

Q. Okay. September 28th, do you remember missing that visit?

A. I do not recall. If it says I did, I probably did.

Q. Okay. October 8th, 2018 --

A. I don't remember.

Q. -- do you recall missing that visit?

A. I don't remember at all.

Q. And do you recall missing a visit on October 25th, 2018?

A. I don't remember going two months without seeing my kids, no. I don't recall that, no.

Q. Okay.

A. Not until this -- Not until the December Order was stated. This is the first time I missed that many visits ever.

Q. But you've already stated that if the notes say it is, then it's probably right.

A. Well, no, but I can also attest that I've never missed two whole months because I would be going -- I would start crying at that point. So, I can actually say that for sure.

Q. Okay. So, in November, November 5th of 2018, do you recall that visit?

A. No, ma'am.

Q. Okay. Do you remember bringing the kids any gifts?

A. I always tried to take them a little something. So, no, I don't recall exactly what I took them at that time.

Mother stated that she had not acted sooner in fulfilling her responsibilities because she was "angry." Mother stated further that she intended to forego rehab in favor of prayer. Mother testified:

Q. But after we filed -- after the Department filed the TPR Petition, you decided to not be angry anymore?

A. Well, if you think about it, that kind of pisses -- kicking somebody's butt when they figure out that their kids might he gone forever. So, yeah.

Q. So, forever versus two years?

A. Actually, it was a year and some months. And, yes, it does take -- When you're feeling like everybody is out against you at one point because, you know, the drinking and all that, you know, it gets to you and it takes a toll on you. And, so, I quit all of that for my kids and I went back to church and now here I am and that's finished.

Q. So, you're saying you're completely done with drugs and alcohol?

A. Yes, ma'am.

Q. Okay. And you've been sober three months?

-6-

A. Yes, ma'am.

Q. In April?

A. Yes, ma'am.

Q. Okay. Congratulations.

A. Thank you.

Q. Now, have --

THE COURT: It's a great start.

THE WITNESS: Yes, ma'am.

Q. Have you and Ms. Dixon talked about Intensive Outpatient Classes --

A. Yes, ma'am.

Q. IOP?

A. And I told her my stand on that. There's no way that I was able to do my classes and work and take care of a household. There was no way I could do it. And I looked at her and I told her, I said, sometimes what you all may feel like rehab is or inpatient -- no, Intensive Outpatient, whatever --

Q. Let's just say IOP.

A. -- I don't need that. I've needed, you know, to go back to church. And that's what has helped me.

Q. So, you're not in any rehab program?

A. Huh-uh. I went back to church and that has kept me being sober. Sometimes you've got to call on a higher power.

Q. You're not receiving any counseling?

A. No, ma'am.

Q. Any substance abuse counseling?

A. Yeah, I'm receiving counseling. You know what it is, it's called prayer.

Q. Okay.

A. That's what it's called, the Bible and prayer.

Q. Okay. How long have you had a substance abuse problem?

A. Well, it started every now and then when I was of, course, eighteen. But then whenever I started getting abused by my husband, that's when I started drinking more.

Q. How old are you now?

A. I'm thirty-three. I will be thirty-four [in] April. . . .

Q. So, from eighteen to thirty-three --

A. Uh-huh.

Q. -- you've had a substance abuse problem?

A. I wouldn't call it a substance abuse problem until I had turned -- Maybe twenty-five is when I started like having a problem drinking. But before that, I would just sparingly drink, but I never had a problem with it.

Q. But methamphetamine you've used --

-7-

A. Phentermine. And I have used that.

Q. You've never prescribed any proof --

A. No. I mean --

Q. You've never provided any kind of proof --

A. Like I said, I was angry and I wasn't showing nothing. I was more fighting against it.

Q. So, on January 14, you tested positive for Oxycodone?

A. Yes, ma'am.

Q. Okay. Did you ever provide a prescription for it?

A. No, because me and her had a conversation about that and I told her, I said, do you remember I called -- Because I had texted her from the hospital letting her know I was at the hospital because I had hurt my back. And that's the only thing they gave me was one. So, it wasn't like -- I didn't know how long it stays in your system. So, it wasn't like I was trying to hide nothing from that, either.

Q. Okay. Did you give her hospital records?

A. No, probably not. Probably not. I don't know because I didn't see her again until March, March something because she disappeared for a couple of months.

Continuing her testimony, Mother testified regarding her missed visits with the Children:

Q. Have you ever canceled visits that you [were] given adequate notice on?

A. The whole time or just from those dates?

Q. No, just the four months.

A. Probably two of them because I did think I had a ride and they pulled back off on me at the last minute. So, probably two of them --

Q. Okay.

A. -- I probably did not have an adequate excuse for, you know, because I just realized that any excuse isn't an excuse, anyway. So --

Q. You heard Ms. Dixon say you've never asked for any help at all. Did you ever tell her that transportation was an issue?

A. Yes, I always told her transportation was an issue.

Q. Did you ever ask for any suggestions?

A. Yeah. And that's when they said that they had -- they are supposed to just help us for the first few times going back and forth and it was up to us to find our way, talking about me and Mr. [G.], too.

Q. Did you have an opportunity to contact ETHRA about transportation?

A. Yes, but it was three dollars there and three dollars back.

Brooke Molhusen ("Molhusen") testified next. Molhusen worked for Centerstone, a provider contracted through DCS. Molhusen managed Jaslene's case. Molhusen scheduled and arranged certain visits between Mother and the Children, while DCS arranged others. Visits were scheduled a week or two in advance. According to Molhusen, in the four months before the petition was filed, Mother had visited the Children once. Molhusen stated that the Children appeared happy and bonded.

Last to testify was Kincaid, the family intervention specialist for Omni that Dixon had referenced in her testimony. Kincaid stated that her work involved helping people complete their DCS-ordered responsibilities. Kincaid began working the Children's case in January 2019. When asked about Mother's progress on her permanency plan, Kincaid testified:

Q. Since you've had the case, what all specifically has the mother done?
A. Like I said, she already had the housing. She completed the CNA course. She's now a certified CNA worker. She's got a job. Maintains that employment. She's passed every drug screen since I've known her that's been given. And, and just getting the home ready for the children, like adding things to their rooms and stuff they'll need.
Q. If the facts of this case reveal that she had done nothing for DCS in some time, what did you do magical in the small time you've had the case to, to light a fire under her?
A. I don't know that it was magical. She was always really cooperative, though. I mean, anything I suggested or -- Yeah, I didn't find it hard to get her to do anything.
Q. Okay.
A. So, just work with her, maybe show her some resources or show her that I had done something and this is what she needed to do next or --
Q. Did you give her any more attention than you would any of the rest of your clients?
A. No, I don't think so.
Q. But you found out if gave her attention, though, she worked?
A. Oh, absolutely.
Q. As far as the Permanency Plan is concerned, is there anything in your opinion that she lacks doing on the Permanency Plan?
A. Nope. No.

On cross-examination, Kincaid testified, in part:

Q. . . . So, you stated that you were helping her clarify the misinformation given from the Health Connect Assessment. And you mentioned IOP. Was

that -- Can you, can you elaborate more on [Mother's] IOP? Was it a recommendation or was she enrolled in classes? Can you just tell us --

A. It was a recommendation --

Q. -- what you meant by that?

A. It was a recommendation from her Assessment.

Q. Okay.

A. That's, that's where the issue lied. The Assessment was inaccurate about a lot of things. So, to recommend something off of something that wasn't right, that was what we were trying to --

Q. Did she -- Did you -- Were you able to get her a new Assessment?

A. No.

Q. So, were the -- Did the recommendations remain the same after they corrected that she was a white male?

A. I don't know what -- I don't know where that stands. I don't imagine fixing that would have been how to do it. A new Assessment is what I would have preferred.

Q. Did you tell Health Connect that you preferred a new one?

A. Well, that's not up to me. That's between her case -- DCS and her and them.

Q. Okay.

A. As then far as I know, they knew, too.

Q. And did [Mother], did [Mother] deny that she was a heavy drinker?

A. She didn't deny that drinking was an issue, but what the Assessment said she said, she hadn't said that. She said that wasn't part of her interview.

Q. Did you speak to the person that did the Assessment?

A. I did.

Q. Okay. And did you bring that up?

A. Yes, I did.

Q. And when did you start drug screening [Mother]?

A. I don't drug screen.

Q. Who does?

A. Health Connect and DCS as far as I know with her.

Q. Okay. But you said she's passed every drug screen?

A. Right.

Q. Since when?

A. Since January when I came on board.

In May 2019, the Juvenile Court entered its final judgment terminating Mother's parental rights to the Children. The Juvenile Court found, by clear and convincing evidence, that the following four grounds were proven: abandonment by failure to visit,

substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest a willingness and ability to assume legal and physical custody of the Children. The Juvenile Court dismissed the ground of failure to provide a suitable home. The Juvenile Court found also that termination of Mother's parental rights is in the Children's best interest. The Juvenile Court stated in its order, in pertinent part:

[Failure to Visit]

The children were placed in a foster home in Chattanooga, which has made visitation for the mother difficult due to the mother's lack of steady employment/income and lack of transportation.

The trial evidence establishes that [Mother] visited with her children a total of 4 times during the four (4) month period preceding the filing of the Petition to Terminate her rights. She protested that she could not get the DCS case managers to communicate with her in a timely manner, stating that she was often notified only a day or two in advance of out of town visits. The mother explained that she had no transportation on short notice or she could not get off work to accommodate the visits. However, the court notes that visits were arranged on a fairly predictable bi-weekly schedule. There was no proof concerning whether the mother ever asked that visits be rescheduled to accommodate her work or transportation issues.

The case manager from Centerstone also assisted in scheduling visits for [Mother]. Her testimony clearly established the [Mother] was given reasonable advance notice of visits on the following dates but failed she failed [sic] to appear for same: August 3, September 10, and October 8, 2018.

[Mother's] visitation schedule during the approximate four month period preceding the filing of the TPR Petition in this case was as follows:
June 19, 2018: no visit was scheduled because the case manager did not have the mother's current phone number
July 6, 2018: the mother failed to attend the visit
July 18, 2018: mother visited
August 3, 2018: mother failed to attend
August 27, 2018: children were brought to court for permanency hearing but mother failed to attend court
September 10, 2018: children were transported from Chattanooga to Knoxville to accommodate visitation, but mother failed to attend visit
September 28, 2018: mother failed to visit, stating she had a new job and could not get off work. Again, no proof was offered as to whether the

-11-

mother asked that this visit be rescheduled to accommodate her work schedule.

October 8, 2018: mother failed to attend visit
October 25, 2018: mother failed to attend visit
November 5, 2018: mother visited, brought gifts to children
November 19, 2018: mother visited; D.C.S. worker transported mother to Chattanooga for visit
December 10, 2018: mother failed to visit
December 17, 2018: no contact order issued by court due to mother testing positive for meth.

The mother has not visited or seen her children since December, 2018. Out of 10 scheduled visits during the 4 plus months prior to the filing of the TPR Petition, the mother attended a total of 3 visits. The mother admitted at trial that she did not ask D.C.S. for help because she was angry.

The foster mother has been cooperative in encouraging [Mother's] relationship with her children and set up a schedule of telephonic visits two times weekly between the children and their mother. She testified that, since July 25, 2018, [Mother's] telephone calls to the children were at first "sporadic" but improved for awhile and the mother would call every Sunday and speak to the children for about 5 minutes each time. She noted that at times [Mother] sounded intoxicated and her speech was slurred.

Based upon the foregoing facts, the Court finds that the mother willfully failed to exercise more than token visitation with her children. The mother was disadvantaged but chose to let her anger prevent her from taking advantage of the services and assistance available to enable her to preserve her relationship with her children.

\*\*\*

[Substantial Noncompliance with the Permanency Plan]

Permanency plans were ratified by this court on November 20, 2017, and August 27, 2018, prior to the filing of the TPR Petition. [Mother] attended the permanency hearing on the first plan on November 20, 2017, and signed her approval of that plan at the CFTM on August 30, 2017. She signed and approved the second plan on February 2, 2018. The second plan mirrored the first plan except for deletion of the requirement that [Mother] attend domestic violence classes. The court finds that the requirements/steps of both plans are reasonable and related to remedying the conditions which necessitate foster care placement.

-12-

The permanency plans for [Mother] provided the following applicable steps for the mother to complete:

1. Mother will schedule, attend, participate in and complete a alcohol and drug assessment and follow all recommendations of same.
2. Mother will participate in therapeutic visitation if recommended.
3. Mother will schedule, attend, participate in and complete a mental health assessment and follow all recommendations.
4. Mother will submit to random, observed drug screens and provide medications for verification. The plan further notes that failure to appear for drug screens within 2 hours will constitute a failed drug screen.
5. Mother will visit the children at least 2 times per month.
6. Mother will provide proof of reliable transportation.
7. Mother will learn to utilize ETHRA and TENNCARE transportation to "ensure" that her and the children attend all medical, dental and behavioral health appointments.
8. Mother will show stable housing.
9. Mother will pay child support of $10 monthly through the TCES system.
10. Mother will complete parent education classes.
11. Mother will obtain and maintain employment and provide proof of same to DCS.
12. Mother will refrain from incurring any legal charges.
13. Mother will assist the department in identifying relative resources who might be placement options.

The mother completed a drug and alcohol assessment on February 11, 2019, but refused to follow the recommendations. She also completed a mental health assessment but would not participate in the recommended grief counseling. She completed a parent education course in January, 2019. She has obtained more reliable employment in 2019, but did not provide any proof of her income. [Mother] did not make any visible, objective effort to comply with or complete **any** of the permanency plan steps until almost 2 months following the state's commencement of this proceeding to terminate her rights. She continues to adamantly refuse to participate in the recommended substance abuse and mental health treatment. She does not have stable housing or transportation. Her financial ability to support and care for 3 young children remains doubtful.

The Court specifically finds that [Mother] has failed to make meaningful efforts to complete the most important permanency plan steps before the filing of the Petition to Terminate. While her efforts following the filing of this case may be relevant in the court's best interest evaluation, the Court finds by clear and convincing evidence that [Mother] has failed to

-13-

substantially comply with and complete the requirements of the Permanency Plan ratified in this case.

\*\*\*

[Persistent Conditions]

[Mother] has had more than ample opportunity to remedy the conditions leading to her children's removal from her custody in 2017. It has been almost 2 years since these children were removed from her custody, but [Mother] failed to take this situation seriously or make any significant improvement in her circumstances until months after the filing of the Petition to Terminate her rights. By [Mother's] own admission, the year of 2017 was a blur to her. From the court's perspective, [Mother's] progress toward putting her life and her family back together during 2018 doesn't look much better.

The conditions that were the most compelling grounds for removal of these children were the mother's homelessness, lack of income, and drug abuse. These conditions continued to persist as of the date this Petition to Terminate Parental Rights was filed. [Mother] was abusing illicit drugs and alcohol in July, 2017. She continued to regularly abuse both drugs and alcohol until February or March, 2019, almost 4 months following the filing of the TPR Petition in this case. In July, 2017, she was unemployed and homeless. In March, 2019, she still had no stable home of her own, but lived subject to the whims of her boyfriend who also appears to have substance abuse issues. In July, 2017, the mother had inadequate income to support herself and her 3 children. In March, 2019, she still could not produce proof of sufficient income to support her family.

It is extremely doubtful that the mother's circumstances will be remedied in the near future. It has already been more than 2 years since these children were removed from their mother. Continuation of this parent child relationship greatly diminishes any hope they have for early integration into a safe, stable, and permanent home.

For these reasons, the Court finds by clear and convincing evidence that the conditions which necessitated removal of these children from their mother still persist, and that the conditions of T.C.A. §36-1-113(g)(3) for termination of the mother's rights have been met.

\*\*\*

[Failure to Manifest an Ability to Parent]

-14-

Even considering the progress this mother has made over the past few months, she still does not possess the present ability to parent these children. [Mother] has been clean and sober for only a few months, after many years of substance abuse. She refuses to participate in proven, evidence based methods of treatment recommended by her drug and alcohol assessment. After almost 2 years, this mother has begun to pursue a career as a certified nursing assistant, but she did not present any proof of income or ability to financially support 3 children in the near future. She has no home of her own. Instead [Mother] continues to rely upon a boyfriend, with whom she has had a volatile relationship in the past, for her housing and transportation. She has not even seen her children in five months.

The second prong of T.C.A. §36-1-113(g)(14) requires a court to find that placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. There is no direct proof of possible physical or psychological danger to these children if they were returned to their mother today except for the emotional damage that will result from returning to a mother who is neither emotionally or financially equipped to care for them at present. Clearly, returning these children to their mother under the present circumstances poses a risk of substantial emotional harm to them from the mother's inability to provide for them.

The facts of this case support a finding by clear and convincing evidence that all elements of T.C.A. §36-1-113(g)(14) have been proven; that this mother has failed to manifest an ability to parent in the 2 years since the children were removed from her; and, that returning this children to her custody at this time would pose a risk of substantial psychological harm to the children.

***

[Best Interest]

T.C.A. §36-1-113(i) sets out a non-exhaustive list of factors to guide the Court's best interest analysis.

Considering the enumerated factors:

[Mother] has not made such an adjustment of her circumstances and conduct that would make [it] safe and in the children's best interest to return to her care and custody.

Her DCS case managers have made reasonable efforts to assist [Mother] in securing funding for assessments and treatment, but she refuses to avail herself of necessary treatment and services.

These children are in a loving pre-adoptive home where they are well cared for. They are healthy and happy. The foster parents are financially able to provide for all of the children's daily and medical needs. They have a stable home and family life. In contrast, their mother still does not have a home of her own or a stable track record of employment. She continues in an uncertain relationship with her paramour. She is to be commended for finally getting clean and sober and for her commitment to her church. But recovery takes time and [Mother's] recovery is still in its infancy. It is too early to predict whether she will be successful in her endeavors or not. In the meantime, these children need permanency and stability now. They should not have to wait in limbo any longer to see if their mother can maintain.

[Mother's] relationship with these children over the past two years has been inconsistent at best. All of these children were bonded to their mother prior to their removal into state custody, but no doubt time has taken it's toll. They have not seen or talked to their mother in months. Previously, they spent time with [Mother] for only a few hours every month or two when she was able to attend visits. Even her phone calls were limited and sporadic. Some of the missed visits were not this mother's "fault," but the end result of this mother's sporadic and inconsistent relationship with her young children is the inevitable deterioration of their relationship.

The best interests of the children trump all other considerations or grounds for termination of parental rights. The court commends [Mother] for her recent efforts to better herself and resolve her long standing issues. Improvement toward compliance should be considered in a parent's favor. See State Dept. of Human Services v. Defriece, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996) (stating that decision reversing trial court's termination of parental rights was influenced by evidence of improvement in mother's ability to provide a stable environment for child) Id. This court has considered the improvements made by this mother, but they are simply not enough to tip the scales toward reunification with her.

For all of these reasons, the Court finds by clear and convincing evidence that termination of [Mother's] parental rights is in [the Children's] best interests.

Mother timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Mother raises the following single issue on appeal: whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re*

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

*Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### *B. Standards of Appellate Review*

---

[4] Tenn. Code Ann. § 36-1-113(i).

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Mother has not challenged any of the grounds for termination found against her. Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

Four grounds for termination were found against Mother: abandonment by failure to visit, substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest a willingness and ability to assume legal and physical custody of the Children. These grounds are defined by statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or

omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

***

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; . . .

Tenn. Code Ann. § 36-1-113(g)(1)-(3), (14) (Supp. 2019).[5]

The specific type of abandonment at issue in this case, failure to visit, is defined as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2019).

Visitation may be so insignificant as to be deemed token in nature. "Token visitation" is defined thusly:

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

Tenn. Code Ann. § 36-1-102(1)(C) (Supp. 2019).

The first ground we review is that of abandonment by failure to visit. The Juvenile Court's findings relative to this ground include instances of Mother's visitation or lack thereof from before, during, and after the relevant four month window. This Court has interpreted Tenn. Code Ann. § 36-1-102(1)(A)(i) to mean that the four month window "includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014), *no appl. perm. appeal filed*. The petition was filed on November 21, 2018. Therefore, the relevant time period is July 21, 2018 through November 20, 2018. Neither the Juvenile

---

[5] We apply the statutes as they were in effect on November 21, 2018, the date the petition was filed.

Court nor the parties appeared to ever reach a consensus on which precise period to examine. The Juvenile Court's findings speak of Mother's "visitation schedule during the *approximate* four month period preceding the filing of the TPR Petition" and the "10 scheduled visits during the 4 *plus* months prior to the filing of the TPR Petition." (Emphasis added). The four month window is statutory and precise. For purposes of this ground, we are not interested in Mother's failures to visit before or after the four month window. These extraneous dates serve only to muddle the issue as to this ground, an issue concerning Mother's fundamental right as a parent. In addition, the testimony at trial was discrepant as to Mother's visitation in the four month period. For example, did she visit four times, as alleged in the petition and testified to initially by Dixon, or one time, as later testified to by Dixon? There simply is too much ambiguity in what should have been a simple analysis of whether Mother failed to visit or exercise more than token visitation in the clearly ascertainable four month window. This record contains evidence that Mother failed to visit the Children on several occasions in the four month window. Nevertheless, given the lack of clarity as to which of Mother's failures to visit the Juvenile Court held against her, the evidence falls short of clear and convincing. We, therefore, reverse the ground of abandonment by failure to visit.

We next address the ground of substantial noncompliance with the permanency plan. It is undisputed that Mother completed multiple tasks on her permanency plans. However, these achievements occurred after the petition was filed. In another parental rights termination case, this Court stated: "[T]he Parents' refusal to complete a number of the requirements until after the termination petition was filed . . . was simply '[t]oo little, too late' . . ." *In re Emily N.I.*, No. E2011-01439-COA-R3-PT, 2012 WL 1940810, at *16 (Tenn. Ct. App. May 30, 2012) (quoting *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003)). Mother offered no reason other than her anger, which we find less than compelling, as to why she waited until after the petition was filed to get moving in earnest on her permanency plan responsibilities. Her tardy completion of certain tasks is better than nothing, and may factor into our best interest analysis, but it will not avail her as to this ground. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven by clear and convincing evidence.

The third ground we address is that of persistent conditions. The Children were removed from Mother's care in July 2017 and adjudicated dependent and neglected in August of 2017. More than six months passed since the Children's removal. The Juvenile Court found that the conditions necessitating removal—Mother's homelessness, lack of income, and drug abuse—persisted, were unlikely to be remedied any time soon, and that continuation of the parent-child relationship greatly diminished any hope they have for early integration into a safe, stable, and permanent home. While Mother is not exactly homeless, her living situation is precarious. Mother has only begun to truly address her substance abuse problems, and even now is defiant about treatment. Finally,

there is no proof that Mother can adequately provide for the Children. In multiple respects, Mother's circumstances remain what they were at the time of removal, with no indication they are likely to change fundamentally. We find, as did the Juvenile Court, that the ground of persistent conditions was proven by clear and convincing evidence.

The fourth and final ground we review is that of failure to manifest a willingness and ability to assume legal and physical custody of the Children. Relative to this ground, the Juvenile Court found that despite Mother's late progress, she "refuses to participate in proven, evidence based methods of treatment recommended by her drug and alcohol assessment." The Juvenile Court found that Mother had no home of her own, relies upon her boyfriend with whom she has had a tumultuous relationship, and produced no proof of income or ability to support the Children. Mother only began to act with any degree of alacrity after the petition to terminate parental rights was filed. At trial, Mother testified to her love for the Children and willingness to take care of them. We do not dispute Mother's love for the Children, but her actions matter more than words. By her actions, or perhaps more to the point, her omissions, Mother has failed to manifest a willingness and ability to assume legal and physical custody of the Children.

This ground also requires a finding that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. The Juvenile Court found that there "is no direct proof of possible physical or psychological danger to these children if they were returned to their mother today except for the emotional damage that will result from returning to a mother who is neither emotionally or financially equipped to care for them at present." The Juvenile Court found further that "returning these children to their mother under the present circumstances poses a risk of substantial emotional harm to them from the mother's inability to provide for them." The evidence does not preponderate against these findings of the Juvenile Court. We find, as did the Juvenile Court, that the ground of failure to manifest a willingness and ability to assume legal and physical custody of the Children was proven by clear and convincing evidence.

Having affirmed three of the four grounds for termination found by the Juvenile Court, the final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. When at least one ground for termination of parental rights is proven, courts then consider a number of statutory factors in determining whether termination is in a child's best interest:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

In her brief, Mother articulates her argument as to why termination of her parental rights is not in the Children's best interest, from which we quote a portion:

From May 2017 through January 2019, when DCS was assisting her she made no progress. However, once the Omni specialist began working with her she made immediate progress. Kennette Kincaid was the family preservation specialist with Omni. Her job was simply to encourage the mother to comply with her permanency plan. Upon receiving the case she was able to immediately get into contact with the mother. The biggest problem the specialist had was getting a copy of the mother's permanency plan. It took over a month. This after trying to contact not only the case manager but also her supervisor by email and telephone. But the mother was compliant with everything that she asked of her. The Omni specialist said that the only thing she did was provide the mother attention for []her to work the plan. In two months she was able to get the mother to do more than DCS was able to in two years. Perhaps if DCS had provided more attention as a reasonable effort this case would have had a different outcome.

(Record citations omitted). DCS, for its part, argues that "[Mother's] housing situation is no better than when the children were removed—she lived with her boyfriend who has substance abuse issues and multiple drug-related charges, and he has evicted her in the past when they separated." DCS points out, correctly, that despite a recommendation that she receive therapy, "Mother refused to take advantage of these services, claiming all she needed to stay sober was church and prayer."

After the petition seeking to terminate Mother's parental rights was filed and her anger abated, Mother took certain positive steps. Mother completed parenting classes. Mother provided DCS with a lease agreement. Mother had a place to live, albeit her boyfriend's home. Mother completed an alcohol and drug assessment. Mother began passing drug screens. There is no question that Mother made some progress beginning in early 2019. Also to Mother's credit, she made some child support payments.

The paramount focus of a best interest analysis in a parental rights termination case, however, is on the child's best interest, not the parent's. It is not as simple a matter as whether a parent checks the right boxes. This case began with Mother unable to care for the Children because of her housing situation, her drug abuse, and her lack of income. It is not at all evident that Mother has remedied these conditions. Mother lives in her boyfriend's home. Mother's boyfriend has kicked her out before, and that situation is of dubious stability. Mother apparently is working again, although she has not produced proof of sufficient income to support the Children. Mother's employment history over the course of the case has been sporadic. Regarding substance abuse, perhaps the greatest barrier to Mother successfully parenting the Children, Mother has made recent strides. Her recovery, however, is in its early stages. Mother's rejection of therapy in favor of

prayer tends to negate much of the good she did late in the case. Incidentally, Mother never explains why she cannot attend therapy and exercise her religious beliefs at the same time. Regrettably, Mother's defiant stand against treatment casts doubt on the sustainability of her recovery.

The evidence reflects that the Children are happy and bonded in their foster home. The Children deserve permanency, and it is doubtful that Mother will be in any position to properly care for them any time soon. This is especially so given Mother's strong stand against treatment. Mother's gains, while good, are too limited and have come too late. We find, as did the Juvenile Court, that the evidence is clear and convincing that termination of Mother's parental rights is in the Children's best interest.

### Conclusion

Aside from the ground of abandonment by failure to visit, which we reverse, we otherwise affirm the judgment of the Juvenile Court terminating Mother's parental rights to the Children. The judgment of the Juvenile Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Chaunte G., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE